UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOHN MORRISON,

      Plaintiff,

   v.

THE PNC FINANCIAL SERVICES
GROUP, INC. AND AFFILIATES LONG
TERM DISABILITY PLAN,

      Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 13-804
(JEI/JS)

**OPINION**

**APPEARANCES:**

HAGNER & ZOHLMAN, LLC
By: Thomas Joseph Hagner, Esq.
57 Kresson Road
Cherry Hill, NJ 08034
    Counsel for Plaintiff

EDWARDS WILDMAN PALMER LLP
By: Stephanie Beth Underwood, Esq.
44 Whippany Rd., 2nd Fl.
Morristown, NJ 07960
    Counsel for Liberty

**IRENAS**, Senior District Judge:

    John Morrison ("Plaintiff"), a Human Resources manager at

PNC Financial Services ("PNC"), brought this ERISA action to

reverse the denial of his long-term disability benefits claim by

Liberty Life Assurance Company of Boston ("Liberty"), the

administrator for PNC's long-term disability plan.  Presently

before the Court are cross-motions for summary judgment from

1

Plaintiff and PNC Financial Services Group, Inc. and Affiliates Long Term Disability Plan ("Defendant" or the "Plan").  For the reasons set forth below, the Court will DENY Defendant's motion and GRANT Plaintiff's motion in part.

## I.    Relevant Facts

In reviewing the administrative decision at issue, the Court limits itself to the facts in the Administrative Record ("AR").

Plaintiff underwent successful treatment for coronary artery disease ("CAD") in 2009 with heart catheterization and the placement of a stent.  (AR 429)  On June 3, 2011, Plaintiff visited his cardiologist Dr. Asoka Balaratna ("Dr. Balaratna") for follow-up regarding his CAD, hypertension, and dyslipidemia and complained during the visit of "chest fullness under situations of stress at work or at home with his father who had been sick recently."  (Id.)  Dr. Balaratna noted that Plaintiff presented as "stable from a cardiovascular standpoint" but that he and Plaintiff "would consider a stress test especially if his symptoms of chest discomfort were to become more typical or more frequent."  (Id.)  Plaintiff returned to work after this visit.

On August 17, 2011, Plaintiff "felt suddenly in distress" at work during lunch and thought he was "going to pass out." (AR 9, Phone Note 3)  He went home early and visited his primary

care physician Dr. Anthony R. Rodriguez ("Dr. Rodriguez") the following morning. (Id.) He was then hospitalized with a very low heart rate, initially thought to be caused by a problem related to his stent, though his EKG was normal. (Id.) His cardiologist Dr. Balaratna noted that on August 19, 2011, Plaintiff had "noticed increased fatigue over the past week and half." (AR 216)

Plaintiff wore a heart monitor for the next two weeks. (AR 9, Phone Note 3) When the monitor flagged ventricular tachycardia, Plaintiff was readmitted to the hospital on September 26, 2011, where doctors confirmed that his stent was operating fine and officially diagnosed his condition as nonsustained ventricular tachycardia ("NSVT"). (Id.) Based on this diagnosis, Plaintiff received the surgical installment of a pacemaker on October 6, 2011, and was placed on beta blockers to suppress his arrhythmia. (Id.)

Plaintiff's participation in the Plan began on July 1, 2011. (AR 13) Under the Plan, a participant qualifies as disabled during the first 24 months from the date benefits begin if the "disability makes [the participant] unable to perform the material or essential duties of [his] own occupation as it is normally performed in the national economy." (AR 488)

Plaintiff did not return to work after his pacemaker surgery, and he filed a claim for long-term disability benefits

3

on December 13, 2011.  (AR 36-49)  Based on reports from

vocational analyst Rhonda Randolph (AR 310-12) and consulting

physician Dr. Donna Gallik (AR 313-21), Liberty determined that

Plaintiff's job was sedentary and that its material or essential

duties were within his functional capabilities.  (AR 322-25)

Ms. Randolph acknowledged that Plaintiff described his

particular job as one that "would require driving, walking, and

standing at multiple locations" but found that "[a]s defined in

the national economy, this occupation requires work at a

sedentary physical demand level," meaning that even if Plaintiff

could not do his particular job, he was "not disabled from

performing [his] occupation with a different employer."  (AR

323)  To reach this conclusion, Ms. Randolph categorized

Plaintiff's job as "Personnel Recruiter" within the occupation

"Human Resources Specialist, O*Net Code 13-701.00."  (AR 311)

On February 2, 2012, Liberty denied Plaintiff's claim on the

grounds that his condition did not meet the definition of

disability under the Plan.  (Id.)

    Plaintiff appealed this denial, arguing that Liberty had

mischaracterized his occupation (which Plaintiff had claimed was

"Recruiting Manager") and understated its stress level by

failing to account for his management responsibilities.  (AR

332-33)  In support of this appeal, Plaintiff provided two

additional medical documents from Dr. Rodriguez dated January

4

31, 2012 (AR 334-41) and an O*Net job description for Human Resource Managers (AR 342-59).

On the first document, the Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Rodriguez listed Plaintiff's diagnoses as "ventricular tachycardia & pacemaker"; identified his symptoms as "fatigue, shortness of breath [illegible] exertion"; and noted that Plaintiff should sit for no more than two hours a day and stand or walk for no more than one hour a day. (AR 334) On the second document, the Cardiac Residual Functional Capacity Questionnaire, Dr. Rodriguez noted the "significant role of stress" in yielding Plaintiff's shortness of breath and fatigue and marked Plaintiff as "[i]ncapable of even 'low stress' jobs'" because "[Plaintiff] cannot work a full day even at low stress." (AR 337) Liberty referred Plaintiff's appeal to its Appeals Unit on July 31, 2012. (AR 360-61)

On August 1, 3, and 23, 2012, Plaintiff provided additional reports in support of his appeal from Drs. Rodriguez and Balaratna, as well as his psychologist Dr. Jay Segal. (AR 362-69). Dr. Balaratna noted in his August 3, 2012, report that Plaintiff "was started on a Beta Blocker for the ventricular tachycardia, but developed significant side effects of fatigue due to bradycardia." (AR 363) The pacemaker did not improve the fatigue, and "[i]t was necessary to continue the Beta

Blocker medication" despite the fatigue "to suppress his
ventricular tachycardia." (Id.)  Dr. Balaratna added that
Plaintiff "was unable to continue working at his previous job
due to the side effects of the Beta Blocker, Lopressor, with
fatigue and the inability to concentrate on his job." (Id.)
Dr. Rodriguez stated in his August 1, 2012, letter that
Plaintiff's "type of occupation, which at a senior management
position, entails a great deal of stress would be harmful to
[Plaintiff's] health" and that "the stress of working in any
senior or management position would create additional risks and
additional harm to his health." (AR 364)  In his August 23,
2012, letter, Dr. Segal stated that "[c]ontinued stress from any
management position would be seriously deleterious to his
overall health" and "[i]t is not in [Plaintiff's] best interests
to return to a stressful management or any other work
situation." (AR 366)

On September 24, 2012, Liberty requested more time to
determine Plaintiff's appeal. (AR 370-72)  On September 28,
2012, Liberty stated that Liberty had "completed our review and
determined that additional information is needed." (AR 375).
Without rendering an explicit decision on the appeal, Liberty
ordered further investigation on Plaintiff's claim. (Id.)  This
additional investigation involved a second evaluation of
Plaintiff's occupation by Bernadette S. Cook (AR 382-86) and a

second review of his medical records by Dr. Robert Morrison (AR 391-95).  On November 15, 2012, Liberty denied Plaintiff's claim a second time, again on the grounds that Plaintiff did not qualify for benefits under the definition of disability but also on the additional new grounds that even if he did qualify, Plaintiff's disability was a pre-existing condition that the Plan did not cover.  (AR 396-409)

The Plan defines a pre-existing condition as one that "results from an injury or sickness that was diagnosed, or for which you have received medical treatment, consultation or care, or have taken a prescribed medication, within three months prior to the LTD coverage effective date." (AR 495)  The relevant time period to evaluate whether Plaintiff had a pre-existing condition therefore ran from April 1, 2011, to July 1, 2011.

Plaintiff appealed this second determination on April 17, 2013 (AR 437), and Liberty denied the appeal on July 25, 2013 (AR 474-83).  Plaintiff brought this instant suit against Liberty (he later amended the Complaint to name the Plan as Defendant) alleging only one count pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), which empowers a plan participant to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify

his rights to future benefits under the terms of the plan." 29 U.S.C. 1132(a)(1)(B).

Plaintiff now seeks summary judgment on the grounds that Liberty's decision to deny him benefits for failure to qualify as disabled was arbitrary and capricious, as evidenced by various procedural irregularities, including Liberty's unexpected remand of Plaintiff's appeal for a second determination; addition of new grounds for denial during that second determination; "cherry-picking" among its various consulting physicians' medical reports for favorable findings; and refusal to appropriately characterize Plaintiff's occupation. (Pl.'s Br. in Support of Mot. Summ. J. ("PMSJ"), Dkt. No. 48-1)

Defendant opposes Plaintiff's motion and brings its own cross-motion for summary judgment arguing that the arbitrary and capricious standard of review is highly deferential to an administrator's decision and that the denial of benefits here was reasonable based on the evidence. (Def.'s Br. in Support of its Mot. Summ. J. ("DMSJ"), Dkt. No. 49-1 at 22-25) Defendant points to medical and vocational expert reports in the AR that it argues support the reasonableness of Liberty's determination that Plaintiff was not disabled as defined by the Plan (id. at 13-15) and even if he were, that his disability was a pre-existing condition not covered by the Plan (id. at 25-29). In

8

addition, Defendant denies that it engaged in any procedural irregularities.  (Def.'s Opp. to PMSJ, Dkt. No. 72 at 27-30)[1]

For the reasons set forth below, the Court will DENY Defendant's motion for summary judgment on the grounds that Liberty engaged in procedural irregularities that render its denial of Plaintiff's claim arbitrary and capricious.  The Court will GRANT Plaintiff's motion for summary judgment in part and will REMAND the matter in part to Liberty for re-evaluation with reasonable discretion.

## II.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999); *Boyle v. Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).  The moving

---

[1] Defendant also raises various arguments not mentioned in the AR, including that Plaintiff failed to provide evidence that he was under the regular care of a physician as required by the Plan (id. at 7-9) or objective evidence that he suffered from functional limitations (id. at 20).  Because the Court is evaluating Liberty's justifications for its denial of Plaintiff's claim at the time of denial, the Court limits itself to the AR and does not consider these additional arguments.

party bears the burden of establishing that no genuine issue of material fact remains.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed Cir. 2001).  A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 249, 252 (1986).  The court's role in deciding the merits of a summary judgment motion is to determine whether there is a genuine issue for trial, not to determine the credibility of the evidence or the truth of the matter.  *Anderson*, 477 U.S. at 249.

### III. Jurisdiction

The insurance policy at issue is covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*  Plaintiff has filed suit to recover benefits pursuant to Section 502(a)(1)(B) and (g)(1) of ERISA, 29 U.S.C. §1 132(a)(1)(B) and (g)(1), and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### IV.  ERISA Standard of Review

Where a plan gives an administrator discretionary authority to determine eligibility for benefits and construe the terms of

the plan, federal courts must review an administrator's denial of an ERISA claim under an "arbitrary and capricious" standard, meaning:

> [A] court can overturn the decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law. . . . The scope of this review is narrow, and the court is not free to substitute its own judgment for that of the Defendants in determining eligibility for plan benefits.

*Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009) (internal quotation marks and citation omitted).

Despite the narrowness of this standard, this Circuit has found a denial of benefits to be arbitrary and capricious where there are procedural problems.

> [T]he procedural inquiry focuses on how the administrator treated the particular claimant. . . . Specifically, in considering the process that the administrator used in denying benefits, we have considered numerous irregularities to determine whether in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality.

*Miller v. American Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (internal citations and quotations omitted).

In *Miller*, the Third Circuit found five procedural irregularities significant in determining that the defendant's denial of benefits was arbitrary and capricious: the defendant reversed a previous decision to award benefits; imposed non-existent requirements extrinsic to the plan; failed to adequately provide written notice of an adverse benefit

11

determination as required by ERISA; failed to adequately analyze all of claimant's relevant diagnoses, considering only his heart condition and neglecting his anxiety; and failed to consider the specific requirements of the claimant's job.

The presence of procedural irregularities do not change "the standard of review, say, from deferential to *de novo* review" but rather are weighed as factors to consider such any particular one "will act as a tiebreaker when the other factors are closely balanced." *Id.* at 115, 117.


## V.   Discussion

The Plan gives Liberty discretionary authority to determine eligibility for benefits and construe the terms of the plan. (Def.'s Opp. to PMSJ, Argument at 1, Dkt. No. 72 at 15) Nonetheless, the Court finds that Liberty (1) failed to adequately provide written notice of an adverse benefit determination as required by ERISA; (2) failed to consider the specific requirements of the claimant's job; and (3) cherry-picked among its various consulting physicians' medical reports for favorable findings.   The Court weighs these procedural irregularities together to determine whether they overcome the deference granted an administrator under the arbitrary and capricious standard of review.

12

### a. Written Notice under ERISA

Section 503 of ERISA requires that every employee benefit plan:

    (1)   provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

    (2)   afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

The accompanying regulations add that where a disability claim is denied, the plan administrator shall notify the claimant within 45 days of receiving the claim. 29 C.F.R. § 2560.503-1(f)(3). Such notification must be in writing or electronic and must include "in a manner calculated to be understood by the claimant . . . [t]he specific reason or reasons for the adverse determination; . . . [and a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]" 29 C.F.R. § 2560.503-1(g).

The plan administrator may receive up to two 30-day extensions to make a decision if necessary so long as it "notifies the claimant, prior to the expiration of the initial

45-day [or 30-day extension] period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision." 29 C.F.R. § 2560.503-1(f)(3). "[T]he notice of extension shall specifically explain the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim, and the additional information needed to resolve those issues, and the claimant shall be afforded at least 45 days within which to provide the specified information." Id.

A plan administrator must notify a claimant of the determination of an appeal within 45 days of receipt as well, unless "special circumstances" justify an extension, in which case similar written notice indicating the special circumstances and the date by which the plan expects to render a determination must be provided within the initial 45-day period. §§ 2560.503-1(i)(3) and 2560.503-1(i)(1)(i). "In no event shall such extension exceed a period of 60 days from the end of the initial period." § 2560.503-1(i)(1)(i).

The time periods for both initial determinations and reviews of appeals are calculated from "the time a claim [or an appeal] is filed . . . without regard to whether all the

14

information necessary to make a benefit determination accompanies the filing." § 2560.503-1(f)(4).[2]

Here, Liberty failed to comply with ERISA regulations regarding notice of adverse claim determinations by failing to issue a clear and timely decision on Plaintiff's appeal of Liberty's initial determination.[3]

Plaintiff initially applied for benefits on December 13, 2011, and Liberty denied his claim on February 2, 2012. Plaintiff timely appealed that initial determination on July 25, 2012.  Having acknowledged receipt of Plaintiff's appeal of Liberty's initial determination on July 31, 2012 (AR 360-361), Liberty was required to either make a determination by September 14, 2012, or request an extension on that date.  Following Plaintiff's submission of additional medical reports supplementing his appeal on August 1, August 3, and August 23 of 2012, Liberty requested an extension to refer Plaintiff's medical records "for further medical review" on September 24,

---

[2] Where more information is necessary, "the period for making the benefit determination shall be tolled from the date on which the notification of the extension is sent to the claimant" which must enumerate the additional information requested "until the date on which the claimant responds to the request for additional information."  Id.

[3] It appears that Defendant also failed to issue a timely decision on Plaintiff's appeal of Defendant's second determination, submitted on April 17, 2013.  Defendant did not even acknowledge receipt of the appeal until May 20, 2013, but then failed to issue a second determination for another 66 days until July 25, 2013.

2012.  (AR 370)  The Court finds this slight delay was not unreasonable on its own, given Plaintiff's additional filings.

However, more significant procedural delays arose after this letter was issued.  After concluding its medical review, Liberty issued a letter to Plaintiff on September 28, 2012 (AR 375), that Defendant now asserts both disposed of Plaintiff's first appeal and remanded his matter for a second initial determination (DSUMF 41; Def.'s Opp. to PMSJ, Dkt. No. 72 at 27).  The body of the letter, addressed to Plaintiff's attorney, consists in its entirety only of the following text:

> [Plaintiff's] file was forwarded to the Appeal Review Unit, per your request for reconsideration of the denial of Long Term Disability benefits. We have completed our review and determined that additional information is needed to evaluate [Plaintiff's] eligibility for Long Term Disability benefits.
>
> [Plaintiff's] file has been returned to Kimberly Leeson, Disability Case Manager in our Kansas City office, for continued investigation. Ms. Leeson may be reached at [telephone and fax numbers provided].
>
> For further assistance regarding [Plaintiff's] claim, please contact Ms. Leeson.

AR 375.

While ERISA's claims procedures provide no comment on remanding a matter for further investigation, Defendant points to *Kaelin v. Tenet Employee Benefit Plan*, 405 F.Supp.2d 562 (E.D. Pa. 2005), as precedent for more than one initial determination.  In *Kaelin*, the Court found no procedural

16

anomalies where the defendant insurance company responded to plaintiff's "first appeal" with a new initial determination of plaintiff's claim that plaintiff then had to appeal a second time.  *Id.* at 577.  However, in *Kaelin*, the defendant insurer explicitly responded, within two weeks of plaintiff's request of review, that defendant had used an erroneous date of loss in its initial claim denial and would "be making a new determination and will send a new letter regarding your claim now that we know of the error."  *Id.* at 568.  Within 30 days of this response and within 45 days of plaintiff's initial appeal, the defendant then issued its second determination.

Here, Liberty's letter is wholly inadequate as an appellate determination.  Unlike in *Kaelin*, Liberty's letter does not explicitly state that Liberty is reopening its initial determination, which Plaintiff reasonably thought had been completed nearly eight months earlier, or point to a particular error that necessitates such a reopening.  Unlike in *Kaelin*, Liberty's letter neither previews any forthcoming next steps nor expeditiously issues its second determination (which arrives after *another* 45 days have elapsed).  Contrary to explicit ERISA requirements, Liberty provides no information regarding what type of additional information is being gathered or when a complete determination will be made.  Such a letter affords Plaintiff no meaningful clarity regarding the results of his

17

appellate review.  Liberty appears to have simply extended review of Plaintiff's claim until Liberty could find sufficient reason to deny it.  Given ERISA's requirement of written notice of adverse decisions, both initially and upon review, it is no answer to say that Plaintiff could have called Ms. Leeson, the Disability Case Manager, but did not.

After issuing this letter, Liberty requested a second vocational analysis and a second medical review prior to issuing a second determination on November 15, 2012 (AR 396-398) — more than 100 days after Plaintiff submitted his first appeal and nearly a year after he submitted his initial application.  By issuing this second determination without explanation, Liberty created a flurry of confusion (AR 410), which Liberty then made little effort to resolve (AR 415).

Defendant argues that it is Plaintiff's responsibility under the Plan to submit proof of his disability and that benefits may be stopped or not paid if Plaintiff fails to do so. (AR 495-96)  However, once Liberty has decided to make an adverse benefit determination, it is obligated to abide by ERISA's prescribed claims procedures and written notice requirements substantiating and communicating that decision to a claimant.  Failure to do so creates a procedural irregularity that this Court can weigh in determining whether Liberty's denial of benefits was arbitrary and capricious.

18

### b. Specific Job Requirements

In addition to violating ERISA's notice requirements, Defendant failed to properly consider Plaintiff's specific job requirements in evaluating his claim.

In *Miller*, the Third Circuit held that "an administrator's proper consideration of the claimant's ability to perform his or her job requirements in light of the relevant diagnosis is a significant factor to evaluate on arbitrary and capricious review." 632 F.3d at 854 (*citing*, *inter alia, Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 507 (6th Cir. 2005) ("finding that administrator's conclusion that claimant 'might be capable of sedentary work cannot be a rational basis for finding that he was not disabled, given that his former occupation required him to walk, stand, and reach for several hours a day.'")

Here, Liberty offers expert medical reviews that conclude that Plaintiff is capable of sedentary work. (*See* DSUMF ¶¶ 20, 48, 68; AR 315-16, 392, 476)  Liberty does not dispute that Plaintiff "managed a team of four people along with staff in southern New Jersey, Pennsylvania, and northern Delaware" (DSUMF ¶ 8; AR 9, Phone Note 3) or challenge Plaintiff's report that "he spent a lot of time driving, walking and standing" in his job (DSUMF ¶ 26; AR 323).  Rather, Defendant points out that in

order to qualify as disabled under the Plan, "a Participant must establish that . . . for the first two (2) years of his Disability, he is 'unable to perform the material or essential duties of [his] own occupation *as it is normally performed in the national economy*.' (emphasis added)." (Defendant' Statement of Undisputed Material Facts, Dkt. No. 49-2 ("DSUMF") ¶ 4; AR 488)

In other words, the parties should look to accepted occupational resources to determine the essential functions of Plaintiff's occupation, not the particulars of his individual job. (DSUMF ¶ 4; AR 488) Accordingly, Liberty's first occupational analyst found that though "Plaintiff's job duties may include considerable travel, constant talking, frequent sitting, and occasional standing and walking," his occupation "[a]s defined in the national economy . . . requires work at a sedentary physical demand level" only, which are within his functional capabilities. (DSUMF ¶¶ 23, 26; AR 323) As a result, even if Plaintiff could not do his particular job, he did not qualify for benefits because he was "not disabled from performing [his] occupation with a different employer." (AR 323)

In objecting to this report's conclusion, Plaintiff argues that the occupational analysis only addressed the physical demands of Plaintiff's work, failing to account for the mental

20

demands, and that the "Personnel Recruiter"/ " "Human Resources Specialist" classification that Liberty used to characterize Plaintiff's job failed to take into account his management responsibilities.[4]  (PSUMF ¶ 19; Ex. N)  Plaintiff argues that "Human Resources Manager" would have been a more appropriate classification for his relevant responsibilities.  (DSUMF ¶ 31; AR 332-333).

This distinction is relevant to Liberty's evaluation of Plaintiff's condition, because even though Dr. Gallik concluded in her report that Plaintiff was "capable of full-time sedentary work," she acknowledged that "[Plaintiff's] side effects from beta blockers . . . might affect his ability to perform *stressful* sedentary work, such as supervising many employees or travelling for work."  (AR 316) (emphasis added)

As normally performed in the national economy, Plaintiff's suggested job categorization of "Human Resources Manager," with O*Net code 11-3121.00, rates the importance of "stress tolerance" at 90 out of 100, ranking stress tolerance as the second most important attribute in doing the job, behind only "integrity."  (AR 357)  In comparison, the occupation of "Human

---

[4] Plaintiff states that Liberty's classification better describes his responsibilities 15 years earlier, prior to significant advances in his career.  (PSUMF ¶ 19; Ex. N)

Resources Specialist" that Liberty used in its analysis rates

the importance of "stress tolerance" only at 76.[5]

In responding to Plaintiff's appeal, Liberty performed a

second occupational analysis to address the mental demands of

Plaintiff's work, but Liberty again used the same "Personnel

Recruiter"/"Human Resources Specialist" classification.  (AR

382)  Plaintiff gave no explanation except stating in its final

denial of Plaintiff's second appeal that "in regards to the

concerns of the occupational analysis previously completed and

whether or not the proper occupation was identified . . . [t]he

review confirmed the occupational title is correct[.]"[6]  (AR 482-

83)

Defendant argues that Plaintiff's suggested "Human

Resources Manager" category applies to industries other than

banking but has not explained why that should matter here.

(DSUMF ¶ 32)  Defendant also argues that Plaintiff provided no

occupational analysis of his own without explaining why

Plaintiff should be required to do so.  (Id.)  Finally,

Defendant argues that Plaintiff's job did not require "a very

high stress tolerance" even though Defendant acknowledges that

---

[5] Liberty's occupational analysts do not quote this specific number, but they both cite to O*Net in their reports.  O*Net is publicly accessible at https://www.onetonline.org/.
[6] The review added that the O*Net code should be 13-1070.00 rather than 13-701.00, but both codes entail the same "stress tolerance" rating of 76 on O*Net.

it requires "dealing calmly and effectively with high stress situations."  (Id.)[7]

The Court finds these arguments unreasonable.  No doubt "what is stressful to one person may not be stressful to another," (AR 386) but O*Net objectively characterizes Plaintiff's claimed occupation as higher stress than the occupation Liberty utilized.  Such stress is medically relevant to Plaintiff's diagnosis, according to not only Plaintiff's own physicians (AR 337, 366) but also Defendant's consulting physician, Dr. Gallik (AR 316).  Liberty's glossing over of this relevance of stress, and its insistence on using the lower-stress classification of Plaintiff's occupation without adequate justification, support a finding that the administrator's decision was arbitrary and capricious.

### c. Cherry-Picking Among Consulting Physicians' Reports

In addition to Liberty's failure to comply with ERISA's claims procedures and accurately characterize Plaintiff's job requirements, the Court finds troubling Defendant's selective utilization of evidence.

---

[7] Even utilizing Defendant's chosen occupational category, Liberty's second occupational analyst found that in Plaintiff's occupation, "the individual must be able to meet deadlines, deal with unpleasant people, be exact or accurate[,] and be flexible," all of which requires "high levels of concentration, focus, memory, [and] problem-solving[.]"  (AR 386)

23

While an administrator need not "blindly" rely on a claimant's own statements regarding his condition or even be particularly deferential to his treating physicians, Liberty is not entitled to cherry-pick among medical reports, including among its own consulting physicians, "disfavor[ing] the claimant at each crossroads." *Culley v. Liberty Life Assur. Co. of Boston*, 339 F. App'x 240, 244-45 (3d Cir. 2009). ("While Liberty may freely rely on its consultants, without giving special deference to the views of treating physicians, neither may it turn a blind eye to faults in the evidence supporting its consultants' opinions.")  In *Culley*, the Court found that Liberty acted in an arbitrary and capricious manner when it relied on its consulting physician's report over plaintiff's treating physician, even though the consulting physician had never examined plaintiff and inconsistencies had been brought to Liberty's attention. *Id.* at 245.

Here, the Plan provides for the denial of benefits if a claimanat "does not receive regular and appropriate treatment, refuses any appropriate treatment and/or fails to comply with his treatment."  (AR 495-496)  Nonetheless, in denying Plaintiff benefits, Defendant argues that when Plaintiff claimed that the fatigue caused by his beta blockers prevented him from working, his doctor did not reduce his beta blocker dosage, consider alternative medical treatments, or propose any restrictions or

24

limitations on Plaintiff's activities.  (DMSJ, Dkt. No. 49-1 at 11)  Liberty also cited in its final determination a portion of Dr. Zwicke's report arguing that "a reasonable physician would not permit a patient to continue with unacceptable side effects."  (AR 482)

Liberty's cardiologist, Dr. Balaratna, treated Plaintiff for years, for both his coronary artery disease as well as his NSVT.  Dr. Balaratna stated that he recommended that Plaintiff continue with his prescribed dose of beta blockers despite the side effects because they were successfully suppressing his arrhythmias.  (PSUMF ¶ 8, Ex. F)  Plaintiff was entitled to rely on the Dr. Balaratna's suggested treatment, especially given that four of the five medical experts in this matter agree that the treatment, including his continued use of beta blockers, was consistent with the standard of care.[8]

---

[8] In Defendant's first consulting report, Dr. Gallik agrees that the medical evidence supports that Plaintiff's prescribed medication has side effects of "exertional fatigue" which "affect his functional capacity in terms of energy level and ability to perform tasks involving physical exertion," but she confirms that "[Plaintiff's] current treatment plan is consistent with standard of care for patients with his conditions[.]"  (AR 315)  In Defendant's second report, Dr. Morrison stated that "patients with debilitating fatigue from a beta blocker *would* have the medication stopped by their cardiologist as there are alternative therapies that are less likely to cause fatigue" but also noted that Plaintiff's cardiologist's "management of the claimant has been appropriate and consistent with standard of care."  (AR 392)  Only in Defendant's third report is it suggested that Plaintiff's care was not standard:  Dr. Zwicke notes that Plaintiff's treating cardiology "sincerely and strongly felt that the standard of care was that [Plaintiff] required medication therapy or he was at risk for Sudden Cardiac Death.  My suggestions that this was not the case and not the standard of care were not accepted."  (AR 459)

Dr. Zwicke, the only expert who disagreed, stated that Plaintiff's treating cardiologist "sincerely and strongly felt that the standard of care was that [Plaintiff] required medication therapy or he was at risk for Sudden Cardiac Death. My suggestions that this was not the case and not the standard of care were not accepted." (AR 459)  The Court finds unreasonable Liberty's denial of benefits to Plaintiff for failure to seek alternative therapies when his treating cardiologist "sincerely and strongly felt that" his current therapy helped to prevent "Sudden Cardiac Death."

Liberty similarly cherry-picked among its experts' reports with regard to its argument that his disability, if he has one, is a pre-existing condition.[9]  Plaintiff experienced "chest fullness" and went to see his cardiologist Dr. Balaratna on June 3, 2011, who treated him for his existing coronary artery disease, hypertension and dyslipidemia.  When Plaintiff continued to experience distress after this meeting, he returned to the hospital where he was diagnosed with NSVT.  Only after this diagnosis in August 2011 did Plaintiff receive treatment, consultation, care, and medication for NSVT, including the installment of his pacemaker on October 6, 2011.

---

[9] This basis of denial appeared for the first time in Liberty's second determination, long after Plaintiff had filed his appeal of Liberty's initial determination.  Nonetheless, the Court considers the argument here.

Nonetheless, when Liberty issued its second determination on November 15, 2012, it "determined that your conditions coronary artery disease, hypertension and dyslipidemia are pre-existing and your condition of Ventricular Tachycardia is related to a preexisting condition. Therefore, (sic) must deny your claim for Long Term Disability Benefits."

In *McLeod v. Hartford Life & Acc. Ins. Co.*, 372 F.3d 618, 627 (3d Cir. 2004), the plaintiff's "symptom of numbness became relevant as one the Plan used to exclude her from coverage based on a pre-existing condition only once it was deemed a symptom of" her diagnosis, multiple sclerosis. "[T]he symptom becomes a factor in the exclusion process only once it is tied to the diagnosis of the sickness[.]" *Id.* Therefore, even if Plaintiff's symptom of "chest fullness" had been a symptom of NSVT, such a symptom is insufficient to qualify his June 3, 2011, visit to his cardiologist as treatment, consultation, or care for the NSVT that was not diagnosed until August.

The medical reports largely corroborate Plaintiff's position. Dr. Gallik found that "[Plaintiff] was treated for the active diagnoses of sick sinus syndrome and fatigue from 10/6 onward. He did not treat for the same or a related condition from 4/1 to 7 /1/11." (AR 316) Dr. Zwicke's report found only that it was "remotely possible" that Plaintiff's NSVT (and related fatigue) was caused by his coronary artery disease

27

but did not dispute that they are distinctive conditions or
suggest that Plaintiff was diagnosed with ventricular
tachycardia or received medical treatment, consultation, or
care, or took prescribed medication for ventricular tachycardia
within the relevant time period.  (AR 463)

Yet Liberty attempted to rely on Dr. Morrison's report,
which observes that "the claimant was seen June 3rd, 2011, by
his cardiologist . . . for care of his coronary artery disease,
hypertension and dyslipidemia" and that his "coronary artery
disease . . . manifested as symptomatic ventricular tachycardia
requiring beta blocker therapy in September of 2011."  (AR 391)

Such a causal relationship does not meet the definition of
a pre-existing condition provided by the Plan in light of the
standard set out in *McLeod*.  Moreover, Dr. Morrison's report
does not suggest that Plaintiff was treated for NSVT itself in
June[10], nor does he dispute that the two conditions are distinct
from each other.

The record does not support Liberty's finding that
Plaintiff's claimed disability would constitute a pre-existing
condition.  Rather, Liberty reached that conclusion by cherry-
picking among expert reports for findings that favored Defendant

---

[10] In its summary judgment briefing, Defendant has argued for the first time
that Plaintiff was actually treated for ventricular tachycardia in his June
3, 2011, appointment with his cardiologist(Def.'s Opp. to PMSJ, Dkt. No. 72
at 27), but nothing in the record supports this claim and it is contradicted
by numerous statements made by Defendant itself.

while ignoring significant evidence to the contrary, including
findings from its own medical reviewers.

### d. Weighing of Factors

The three procedural irregularities outlined above raise a
concern that Liberty's denial of Plaintiff's claim was made
arbitrarily and capriciously.  The Court now considers whether
they are adequate to reverse Liberty's denial of Plaintiff's
claim.

Liberty's communication with Plaintiff regarding the remand
of his first appeal violated ERISA's notice requirements.
Nonetheless, the Court recognizes that Plaintiff shared some
blame in delaying the submission of medical reports, and Liberty
was within its rights to consider all evidence carefully prior
to making a final determination.  This procedural irregularity
would therefore be insufficient, on its own, to reverse the
denial of a claim that was otherwise defensible based on the
record.

The other two procedural irregularities, however —
Liberty's failure to properly consider Plaintiff's job
requirements and its imposition of non-existent requirements on
Plaintiff to prove his claim — cast doubt on the accuracy of
Liberty's substantive conclusion that Plaintiff did not qualify
as disabled or if he did, that he had a pre-existing condition.

29

The record, including evidence from Liberty's consulting physician Dr. Gallik, suggests that Plaintiff's condition may have impaired his ability to do a stressful sedentary occupation, and the record further suggests that Plaintiff's occupation should be reclassified as a stressful sedentary occupation, given his management responsibilities.

Defendant points out that Plaintiff told his doctor on August 3, 2011, that he liked his job at PNC, that it was "[n]o stress," and that he was able to work from home sometimes.  (AR 142)  However, Liberty's definition of disability requires consideration of an occupation "as it is performed in the national economy."  It is not conclusive, therefore, that Plaintiff at some point personally described his particular job as "[n]o stress."  Liberty's first occupational analyst recognizes that if Plaintiff's particular job requires too much travel, he is expected to work for a different employer that requires less travel, since travel is not an essential component of his occupation.  Unlike travel, however, management responsibility is an essential component of Plaintiff's occupation, and the record suggests that such responsibility objectively requires a high level of stress tolerance.  The Court therefore relies on the objective assessment of Plaintiff's occupation in the national economy as provided by O*Net (an occupational resource cited by both parties) rather

than Plaintiff's individual experience at a particular time at a particular job site.

The Court does not conclude here that Plaintiff's occupation requires too high a level of stress for Plaintiff to be able to perform it.  Rather, the Court weighs heavily Liberty's failure to account for the stress of Plaintiff's job by properly characterizing his occupation, even after the Liberty's own medical expert noted that such stress is relevant to evaluating whether Plaintiff is disabled.  In combination with Liberty's failure to give appropriate notice and its imposition of non-existent requirements, the Court finds Liberty's denial of Plaintiff's claim arbitrary and capricious.

### e. Remedy

Where an administrative decision is found to be arbitrary and capricious, the Court may retroactively reinstate benefits where they were terminated; however, "[i]n a situation where benefits are improperly denied at the outset, it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled." *Miller*, 632 F.3d at 856-57.  *See also Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 56-57 (W.D. Pa. 2011).

Here, Plaintiff seeks a retroactive award of benefits. Because Liberty improperly denied Plaintiff long-term disability

31

Case 1:13-cv-00804-NLH-JS   Document 78   Filed 03/31/15   Page 32 of 32 PageID: 1849

benefits from the outset, the Court does not make such a retroactive award.  The Court instead remands to Liberty to reevaluate whether Plaintiff is disabled (with reasonable discretion in accordance with this Opinion).

Plaintiff also seeks attorneys' fees and costs.  ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. 1132(g)(1).[11]  Having prevailed here, Plaintiff may file a petition for such fees and costs.

### VI.   Conclusion

For the reasons set forth above, Defendant's motion for summary judgment will be DENIED, and Plaintiff's motion for summary judgment will be GRANTED in part and REMANDED in part to Liberty for re-evaluation with reasonable discretion.  An appropriate Order accompanies this Opinion.


Date: 3-31-15


s/ Joseph E. Irenas
**JOSEPH E. IRENAS, S.U.S.D.J.**

---

[11] "To evaluate whether a prevailing plaintiff in an ERISA case should receive an award of attorneys' fees," the Court must consider "(1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deterrent effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position."  *Heim v. Life Ins. Co. of N. Am.*, No. CIV.A. 10-1567, 2012 WL 947137, at *15 (E.D. Pa. Mar. 21, 2012) (*citing Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983).